| | |
|---|---|
| Antonio DeOliveira<br>162 Birdseye St.<br>Stratford, CT. 06497<br>**CLAIMANT** | CORAM<br><br>STATE OF CONNECTICUT |
| VS. | |
| Ross & Roberts, Inc.<br>1299 West Broad St.<br>Stratford, CT. 06497<br>**EMPLOYER** | WORKERS' COMPENSATION<br>COMMISSION |
| and | FOURTH DISTRICT |
| Liberty Mutual Insurance Co.<br>c/o Maher & Williams<br>P.O. Box 550<br>Fairfield, CT. 06611<br>**INSURER** | HON. JAMES J. METRO<br><br>FILE NO. X03146 |
| **RESPONDENTS** | MARCH 30, 1995 |

Appearances:   The Claimant was represented by Laurence V. Parnoff, Esq., 1566 Park Avenue, Bridgeport, CT. 06604

The Respondents were represented by Kevin J. Maher, Esq., P.O. Box 550, Fairfield, CT.

### FINDING AND AWARD

Pursuant to Statutory Notice a Formal Hearing was held on the above-entitled matter before the undersigned Commissioner at the Fourth District Workers' Compensation office in Bridgeport, Connecticut on February 26, 1991, June 10, 1991, August 13, 1991, December 9, 1991, April 22, 1992, July 22, 1992, September 28, 1992, September 28, 1992 when live testimony was concluded, and thence to

January 4, 1993 when depositions of a physician and a psychologist were submitted into evidence and proposed findings of fact were accepted. The parties agreed in June of 1994 to delay the decision of the Commissioner in hopes of resolving all issues by stipulation.

The issues involved at said hearings were the compensability of an alleged back injury and emotional/psychological ramifications allegedly flowing therefrom, together with a claim for benefits.

**THE FOLLOWING FACTS ARE FOUND:**

1) The Claimant had been employed by the Respondent, Ross and Roberts, Inc., at their Stratford plant since approximately 1970.

2) On May 11, 1989, the Claimant was working as a "Blender" at the Employer's plant in Stratford. His hours of work were from 3 p.m. to 11 p.m.

3) During the course of his employment, on May 11, 1989, the Claimant would pick up bags of material off of a skid and load them into a blender, which would mix the materials in furtherance of the manufacturing process of the employer.

4) While near the end of his 3 p.m. to 11 p.m. shift on said date, the Claimant picked up the last bag of material off of a skid and felt a pain in his back, "Like a knife."

5) The Claimant was working alone at the time of the injury to his back, but did fill out his end of shift report, and filed that in the appropriate office at this place of employment.

2

6)   When the Claimant left work shortly after 11 p.m. on May 11, 1989, there were no supervisors in the company office where he had filed his report, and no other employees were present in his immediate work area.

7)   On the same night, the Claimant returned home and informed his wife that he had injured his back and subsequent thereto, took Tylenol for the pain, took a hot bath and used a heating pad on his low back.

8)   At approximately 2 to 3 a.m., the Claimant's back pain worsened and he could not get out of bed.

9)   On May 12, 1989, the Claimant's wife and son helped him out of bed and into the family car, so as to allow the Claimant's son to drive him to the place of employment.

10)   Upon arriving at the Ross and Roberts factory, the Claimant observed two supervisors at the entrance, they being a Mr. Anderson and a Mr. Foley.

11)   The Claimant told Messrs. Anderson and Folly that he had been hurt on the job and that he wanted to go to the company doctor. The Claimant was informed that Ross and Roberts had no, "company doctor."

12)   Mr. Foley informed the Claimant that he could go to Med Now, if he so chose, but that he, Mr. Foley, did not have the authority to approve treatment at Med Now.

13)   The Claimant visited the Med Now facility and filled out a required form and was informed that if he felt better, he could return to work on Monday May 15, 1989.

14)   The Claimant felt worse on Monday, and so he sought the services of Dr. Frank J. Forte, a chiropractor.

15) Upon advice of Robert Kinghorn, the Personnel Manager at Ross and Roberts, the Claimant was examined by Dr. Donald Dworken, an Orthopedic Specialist of Bridgeport, Connecticut. Subsequent to first going to Med Now, the Claimant treated with doctors Forte, Dworken, Lipow, and Ramirez.

16) Claimant's Exhibit No. 6 contains a statement from Dr. Forte's, Chiropractic Offices, Milford, Connecticut, totaling, $6,605 for services rendered to the Claimant, as well as a report of Dr. Forte dated June 7, 1990, wherein Dr. Forte comments on his first treatment of the Claimant on May 15, 1989, and corroborates the Claimant's history of the injury allegedly sustained at work. Dr. Forte diagnoses the Claimant's condition as, "1, Lumbar musculoligamentis strain and sprain injury resulting in herniating of the fourth and fifth lumbar disc. 2, lumbar paravertebral, muscle spasm and myalgia. 3, lumbar radiculopathy."

17) Dr. Forte opines, "Therefore, it is my professional opinion that the injuries sustained are directly and causally related tho (sic) the accident referenced above." (Claimant's Exhibit No. 6)

18) In a report of December 26, 1989, Donald S. Dworken, M.D., notes that he first saw the Claimant on June 8, 1989 and the history set forth in said report confirms the testimony of the Claimant. Subsequent to December 26, 1989, the Claimant continued to treat with Dr. Dworken and his office generated a number of medical reports, and or, office progress notes, together with statement for services rendered in treating the Claimant. (Claimant's Exhibit No. 4; No. 3; No. 7)

19) In a report entitled, "Attending Physicians First Report of Injury" Dr. Forte kept the Claimant out of work for 3 to 4 weeks. (Claimant's Exhibit No. 6)

20) In a report of June 8, 1989, Dr. Dworken kept the Claimant out of work until further notice and recommended that the Claimant continue his treatment with Dr. Forte. (Claimant's Exhibit No. 4)

21) Dr. Dworken previously submitted all of his reports and statements for services rendered to the employer, as is more fully set forth in Claimant's Exhibit No. 19.

22) After having been released for light duty work on September 11 of 1989, the Claimant undertook job searches within his restrictions as is evidenced by Claimant's Exhibit No. 8.

23) On December 20, 1989, the Claimant first sought treatment with Mark Gang, Ph. D., for emotional problems, nervousness, and depression.

24) The Claimant alleges that he again became temporarily totally disabled as of December 20, 1989 because of the emotional and psychological problems glowing from the incident of May 11, 1989.

25) The Claimant was referred on to and treated with Mark Gang, Ph.D, who in a deposition of June 26, 1992, diagnosed the Claimant as suffering from depression and atypical anxiety with symptoms of post traumatic stress.

26) Dr. Gang further opined, "The depression was two-fold. One, he was depressed as a result of the injury, which he sustained at work which produced a tremendous amount of pain, restricted his activities. He was unable to return to work

5

as a result of that, and as a result he was unable to perform daily life activities as he was able to prior to the accident. That was one aspect of his difficulties. Another aspect was he was not receiving any type of compensation for the injury he had sustained, and not having an income produced major financial stress on him and further complicated his condition. He felt that he was being unfairly treated by the company that he had worked many years at and he was quite upset, upset meaning anxious and depressed."

27) In the same deposition, Dr. Gang comments further, "The diagnosis of atypical anxiety with symptoms of post traumatic stress does indicate that his emotional deterioration is directly related to the abuse he feels that he is receiving from the company, from the case not being settled, from the financial hardship that he is under, and the amounts of extreme delay in settling the case. It's been over three years."

28) Dr. Gang was of the opinion that the Claimant was totally disabled form May of 1991 to the date of his deposition, June 26, 1992.

29) Dr. Gang referred the Claimant on to Joseph P. D'Apice, M.D., a Psychiatrist, for treatment. (Deposition of Dr. Mark J. Gang; June 26, 1992; Claimant's Exhibit No. 28)

30) In a deposition of September 24, 1992, Dr. D'Apice states, "After Mr. DeOliveira experienced what he said was sharp pain in his back, he indicated that his life changed; so with reasonable medical certainty it appears that that event was the probable cause of his current physical and emotional symptoms."

31)     In said deposition Dr. D'Apice refers to the physical injury suffered by the Claimant on May 11, 1989 and goes on to relate, "This becomes a narcissistic injury in this way: If you look at loss, loss is being without or being deprived of something we once had. All right. Loss does not only involve the real even, the loss of something; but the individual perceives this loss as -- what's the word? Perceives it as symbolic and personal. All right. Now, what may be a loss for you -- this means a loss of sense of honor, sense of self, all right. Now, in dealing with this sense of self, you not only have a physical injury when you lose a part of your body or a function thereof, you also have a loss of the representation of yourself. Okay."

32)     Dr. D'Apice, in the same deposition opined, "That the narcissistic injury, the symbolic injury was concomitant with the real injury. The two are to go together. Just like you cannot separate the body from the soul."

33)     Dr. D'Apice also commented that, "The result of the injury which was narcissistic. In other words, that injury not only was physical, was not really a -- was not only a real loss, but it was a symbolic loss. In that symbolic loss, remember this individual's a Portuguese fellow, European, who has high standards, high morals, high values; and he felt a loss of face. He felt a loss of honor."

34)     Dr. D'Apice also testified, "It is my medical opinion that the narcissistic injury occurred on May 11, 1989 while the individual was working...The functional overlay was concomitant and associated with the narcissistic injury and Mr. DeOliveira feeling that he was not being treated fairly or rightly."

7

35) Dr. D'Apice also testified that, "it appears that there was an even more dramatic change in his behavior when he felt betrayed by the company and, as he said, lied to by the company; so this reinforces the narcissistic aspect or the psychological aspect of the injury.

36) In response to the following question by Respondent's Counsel: "Mr. DeOliveira was certified as being able go back to work by Dr. Dworken in September of 1989. Assuming that Mr. DeOliveira went back to work at Ross and Roberts in September of 1989, would he be your patient today?" Dr. D'Apice answered, "You're absolutely right, he probably wouldn't."

37) One of the Claimant's supervisors testified that there were no witnesses to his alleged injury on May 11, 1989, that the employer had no, "company doctor," and they had no authority to approve medical treatment for an injured employee.

38) The Respondent provided no direct testimony or medical opinions, or other evidence on cross-examination that the Claimant's physical injury to his back did not occur on the job.

**BASED ON ALL OF THE EVIDENCE BEFORE ME, I FIND, DETERMINE AND CONCLUDE THAT:**

A) The Claimant, Antonio DeOliveira, was an employee of Ross and Roberts on May 11, 1989, working at their Stratford, Connecticut plant.

B) On said date, while lifting a number of bags of material weighing 50 pounds or more, the Claimant suffered a physical injury to his low back, which necessitated his treating with Doctors Forte and Dworken, as well as other physicians.

8

C)  Based on the reports of Doctors Forte and Dworken, I find that the Claimant was totally temporarily disabled from May 12, 1989 through September 19, 1989 and is entitled to temporary total benefits during that period of time.

D)  I find that the Claimant was temporarily partially disabled from September 20, 1989 through his date of maximum medical improvement as concerns his low back, and would be entitled to temporary partial benefits during that period of time based on his having conducted job searches with reasonableness and thoroughness.

E)  I find that the treating physicians of the Claimant for the low back injury were doctors Forte and Dworken, and that the medical treatment provided him by Dr. Dworken was reasonable and necessary and his outstanding bill as set forth in Claimant's Exhibits No. 4, 3, and 7 should be paid for by the Respondent insurer.

F)  The reasonableness of the treatment and the charges billed by Dr. Forte are not decided herein and will be the subject of future hearings.

G)  I find that the emotional and psychological problems which the Claimant developed subsequent to December of 1989 were not the result of the physical injury of May 11, 1989, nor did they flow from said injury.

H)  I find that while the Claimant may have suffered from depression and anxiety subsequent to May 11, 1989, the same were not substantially a result of the physical injury and or pain experienced by the Claimant because of the compensable injury as found above.

I)  I find that the emotional/psychological problems which the Claimant developed and may still be suffering from are a result of his frustration with the

9

treatment he received by his employer, the delays in resolving his claim, a sense of loss of honor, and other factors which he attributes and blames on the employer.

Wherefore, the Respondents are ordered and directed to pay to the Claimant the benefits set forth above, less a credit for 26 weeks of unemployment compensation, which the Claimant stipulated that he received, and less the accident and sickness benefits which the employer paid directly to the Claimant in the approximate amount of $2,658.35.

I find that the Respondent employer's denial of the the compensability of the Claimant's alleged back injury was unreasonable and caused unnecessary delay in the processing of the Claimant's claim and I award attorney's fees to the Claimant in the amount $4,000, to be paid for by the Respondent employer.

I find that the Respondent's denial of the emotional/psychological claim of the Claimant was reasonable as evidenced by this decision, and so any claim for interest, penalties or fines relating thereto is not warranted.

**WHEREFORE, IT IS SO ORDERED, ADJUDGED AND DECREED**

James J. Metro
Commissioner
Workers' Compensation
Commission
Stamford, Connecticut