UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTONIO DEOLIVEIRA, | : | DOCKET NO. 3:02 CV 893(MRK) |
| | : | |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| LIBERTY MUTUAL INSURANCE CO. | : | |
| | : | |
| Defendant. | : | JUNE 9, 2005 |

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

In December, this Court certified five questions to the Connecticut Supreme Court based on the parties' representation and stipulation that the Supreme Court's "answer to the certified questions will determine, or are reasonably certain to enter into the determination of, both the state and federal court actions." (Joint Petition for Certification at 6.)  The first certified question asked:  "Does Connecticut law recognize a cause of action against an insurer for bad faith processing of a workers' compensation claim?"  The other four questions assumed a positive answer to the first and sought additional information about the nature of the claim and its accrual.  In May, the Supreme Court answered the first question negatively, holding that Connecticut law does not recognize a cause of action for this alleged misconduct.  *DeOliveira v. Liberty Mut. Ins. Co.*, 273 Conn. 487, 489-90, 870 A.2d 1066 (2005).  Consistent with the parties' stipulation, the Court  viewed its ruling as dispositive:  "This consolidated action is the culmination of fifteen years of litigation between the plaintiff, Antonio DeOliveira, and the

defendant, Liberty Mutual Insurance Company . . . ." *Id.* at 489.  Unfortunately, DeOliveira and his counsel refuse to accept that the Supreme Court's ruling applies to all of plaintiffs' claims.

Following the Supreme Court's decision, DeOliveira's counsel has asserted that the ruling foreclosed only DeOliveira's claims for "negligence" and "bad faith," and left open his claims for intentional misconduct and unfair trade practices  Thus, a new dispute has emerged between the parties over whether the ruling disposed of all or only some of DeOliveira's claims. DeOliveira's counsel has also demanded that the parties arbitrate over the claims that he asserts remain open.  The parties, however, never agreed to arbitrate over the scope of the Supreme Court's ruling, which is a question preliminary to whether anything remains for arbitration at all. Moreover, any arbitration at this point would be futile because the Supreme Court ruling disposed of all, not just some, of plaintiff's claims.

The Supreme Court's ruling could not be clearer:  the Workers' Compensation Act bars every claim that DeOliveira asserted in his two, pending complaints.  Furthermore, the parties' agreement to arbitrate was narrow in scope and timing.  The agreement, which the parties entered seventeen months before the ruling, contemplated that the arbitration would proceed concurrently with the certification and would likely reach a result before the Court.  The parties identified the scope of the arbitration as covering "all issues that have *previously* been raised in either the State Action or the Federal Action. (Case Management Agreement at ¶ 1 (emphasis added)).  The parties never agreed to arbitrate over issues raised *after* December 2003, including the central issue between them now regarding the scope of the Court's ruling.  Aside from not being arbitrable, this issue is dispositive – just as the parties stipulated and represented to this Court.  Accordingly, Liberty Mutual moves to dismiss this case based on the fact that, as a matter of law, nothing remains of plaintiff's complaint.

**II.     BACKGROUND**

This is one of three actions that this plaintiff has brought against Liberty Mutual over the past fifteen years. *See DeOliveira v. Liberty Mutual Insurance Co.*, 273 Conn. 487, 491-93, 870 A.2d 1066 (2005) (describing the history of lawsuits that DeOliveira filed). Plaintiff filed this suit on April 25, 2002, while a similar case ("*DeOliveira II*") was pending in the Bridgeport Superior Court. (FitzMaurice Aff., ¶¶ 2-3)[1] In April 2002, during jury selection in *DeOliveira II*, the parties agreed, on the record, to arbitrate based on the existing "law of the case" and concurrently to reserve certain legal questions for appellate advice. The transcript from that hearing sets forth the parties' agreement in detail. (*See* FitzMaurice Aff., ¶ 5; Transcript of April 11, 2002, attached as Ex. B to FitzMaurice Aff.)[2] Plaintiff's counsel subsequently refused to sign a joint stipulation for reservation. (FitzMaurice Aff., ¶ 6.)

---

[1] Plaintiff filed this action apparently to cover claims for alleged misconduct occurring after December 1995. *DeOliveira*, 273 Conn. at 493. Defendant removed this action to this Court pursuant to 28 U.S.C. §§1441 and 1446.

[2] Liberty's counsel identified the specific issues, on the record and without contradiction, as follows:
> One, whether the Workers Compensation Act provides the exclusive remedy for the types of claims in this complaint. Two, if the answer to question one is no, then whether any claims that—that exceed the Workers Compensation Act remedies would have to be limited to intentional and deliberate conduct, and then three, assuming the answer to the first question is no, . . . whether one needs to exhaust the workers compensation procedures before pursuing such a claim, or alternatively, whether the claim accrues when the facts happen[s] such that it would [a]ffect the statute of limitations ruling in this—in this case which you made this morning. The fourth is an issue that Mr. Parnoff has identified which is whether the plaintiff and the circumstances would be entitled to access to attorney/client privileged materials . . . .

(Transcript of April 11, 2002, attached as Ex. B to FitzMaurice Aff., at 6-7.)

On December 5, 2003, with the assistance of this Court, the parties reached a procedural agreement that allowed this case and *DeOliveira II* to proceed. (*See* Case Management Agreement and Joint Petition for Certification, attached as Exs. C and D to FitzMaurice Aff.) The Case Management Agreement set out a plan by which the parties in *DeOliveira II* would petition the Superior Court to reserve certain legal issues for appellate advice, and this Court would certify the same questions to the Connecticut Supreme Court. (*See id.*) The certified/reserved issues were as follows:

> A.   Does Connecticut law recognize a cause of action against an insurer for bad faith processing of a workers' compensation claim?
>
> B.   If the answer to A is yes, must a plaintiff asserting such a claim prove that the insurer intentionally or deliberately harmed the plaintiff?
>
> C.   Alternatively, if the answer to A is yes, must a plaintiff merely show that the insurer was negligent?
>
> D.   If the answer to A is yes, does the plaintiff's cause of action accrue on the date on which it is determined that the plaintiff's injury is compensable?
>
> E.   Alternatively, if the answer to A is yes, does the plaintiff's cause of action accrue when the allegedly wrongful conduct produced injury, without regard to the date on which, or whether, the plaintiff's injury is found to be compensable?

(Joint Petition for Certification at 1.)

The Case Management Agreement also provided that the parties concurrently would submit to arbitration "all issues that have previously been raised in either the State Action or the Federal Action. (Case Management Agreement at ¶ 1.) The Case Management Agreement specified deadlines for the appointment of party-arbiters and an umpire and required the parties to make reasonable efforts to ensure the prompt convening of the panel and speedy completion of the Arbitration. (*Id.*) Contemplating that a speedy arbitration would result in an award before the arrival of appellate advice, the Case Management Agreement added the following proviso:

> in the event that the Connecticut Appellate Court or Connecticut Supreme Court answer any of the Certified Questions in a way that would bring into question the standards applied or decisions rendered in the Arbitration, the award entered in the Arbitration will be vacated.

(*Id.*)

Despite these terms, the parties did not proceed with the arbitration. Each party named a party-arbiter but never selected a neutral. Moreover, although Liberty Mutual's selected party-arbiter disclosed all potential conflicts of interest to plaintiff's counsel (*see* Pomeranz letter of March 2, 2004, attached as Ex. E to FitzMaurice Aff.), plaintiff's party-arbiter never followed suit, leaving in question his ability to serve. (FitzMaurice Aff., ¶ 9.) Thus, over the passage of approximately eighteen months, no arbitration took place.

In the meantime, the Connecticut Supreme Court obviated the basis for any arbitration. As the parties anticipated in their joint petition for certification, the Supreme Court gave an "answer to the certified questions [that determined] . . . both the state and federal court actions." (*See* Joint Petition for Certification at 6 (Interests Served by Answer the Certified Questions)). On May 3, 2005, the Connecticut Supreme Court answered the first certified question in the negative, holding that Connecticut law does not recognize a cause of action against an insurer for allegedly mishandling a worker's compensation claim.

> The dispositive question is whether Connecticut recognizes a cause of action against an insurer for bad faith processing of a workers' compensation claim. We conclude that such a claim is barred by General Statutes § 31-284 (a), the exclusivity provision of the Workers' Compensation Act (act), and, therefore, the plaintiff's remedies are limited to those afforded under the act. Accordingly, we answer the first question, as certified by the District Court and reserved by the trial court, in the negative.

*DeOliveira v. Liberty Mut. Ins. Co.*, 273 Conn. at 489-90 (footnotes omitted). The Court did not reach the remaining certified questions regarding the nature and accrual of any cause of action for this conduct, because it concluded none exists. *Id.* at 490, n. 4. Consistent with the parties' representations about the dispositive nature of the questions presented and the Court's ruling on

the first certified question, the Connecticut Supreme Court clearly viewed its decision as ending this dispute:

> This consolidated action **is the culmination of fifteen years of litigation** between the plaintiff, Antonio DeOliveira, and the defendant, Liberty Mutual Insurance Company . . . .

*Id.* at 489 (emphasis added).

Unfortunately, plaintiff's counsel refuses to recognize the dispositive nature of the Supreme Court's ruling and the fact that the time and basis for arbitration have passed. On April 30, 2005, counsel for the plaintiff sent a letter to his previously selected party-arbiter, Lawrence Merly, captioned "NATURE OF CLAIMS: INTENTIONAL TORT AND CUTPA." The letter states, in part, as follows:

> The Supreme Court has answered "in the negative" the certified questions: "Whether Connecticut recognizes a cause of action against an insurer for bad faith processing of a workers' compensation claim." I would, therefore, appreciate your contacting Liberty's arbitrator, James L. Pomeranz . . . to have a neutral proceed to schedule an arbitration hearing on the now limited allegations of the operative Complaint, excluding only the negligence and bad faith counts thereof.

(*See* April 30, 2005 Letter from Laurence Parnoff to Lawrence Merly, attached as Ex. F to FitzMaurice Aff.)[3] Plaintiff apparently now claims that his CUTPA and intentional tort theories somehow survived the Supreme Court's ruling and that some "issues . . . previously raised in either the State Action or the Federal Action" remain to be arbitrated. As explicated below, no claims remain. Accordingly, this case should be dismissed.

---

[3] Plaintiff has asserted two negligence claims, one count alleging negligence and another claiming negligent infliction of emotional distress. Plaintiff did not label any of the counts of the complaint as "bad faith."

## II. ARGUMENT

### A. The Standards of Review

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") tests the legal sufficiency of a complaint. Fed. R. Civ. P. 12(b)(6) (2001). "[T]he office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). The complaint will be dismissed for failure to state a claim when "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Woodford v. Community Action Agency of Greene County, Inc.*, 239 F.3d 517, 526 (2d Cir. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *see also Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "Once the moving party has met its burden, in order to defeat the motion the nonmoving party must 'set forth specific facts showing that there is a genuine issue for trial.'" *Munck v. New Haven Savings Bank*, 251 F. Supp. 2d 1078, 1081 (D. Conn. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment." *Id.* (internal quotations and citations omitted). "Additionally, a party may not rest on the 'mere allegations or denials' contained in his pleadings," *Id.* (quoting *Goenaga*, 51 F.3d at 18), or rely on conclusory statements in an effort to defeat summary judgment. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).

### B.     Who Decides How to Proceed?

DeOliveira's demand that Liberty Mutual arbitrate raises a preliminary issue of who should decide how to proceed: the Court or a panel of arbitrators? The question of arbitrability is a "gateway" legal issue that falls presumptively within the responsibility of a court to resolve. *See, e.g., Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003) (giving as examples of gateway issues: "whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy.") (citations omitted). The policies favoring enforcement of agreements to arbitrate do not alter the fact that arbitration remains consensual process. As the Second Circuit recently noted:

> [I]t remains the case that arbitration "is a matter of consent, not coercion." *Volt Information Sciences v. Board of Trustees*, 489 U.S. 468, 479, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989). Specifically, "'arbitration is a matter of contract,'" and therefore "'a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.'" *Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) (quoting *Transit Mix Concrete Corp. v. Local Union No. 282, International Brotherhood of Teamsters, etc.*, 809 F.2d 963, 967 (2d Cir. 1987)). Thus, "while the FAA expresses a strong federal policy in favor of arbitration, the purpose of Congress in enacting the FAA 'was to make arbitration agreements as enforceable as other contracts, but not more so.'" *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 364 (2d Cir. 2003) (quoting *Opals on Ice Lingerie, Designs by Bernadette, Inc. v. Bodylines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003); further internal quotation omitted).

*JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004).

Courts generally decide issues of arbitrability. A court will refer questions of arbitrability to arbitrators based only on "clear and unmistakable evidence" that the parties intended that

result by agreeing to a broad arbitration clause. *See First Options, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005). In this case, however, no such evidence exists. The parties' agreement to arbitrate is narrow because it is limited to "specific types of disputes." *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825*,* 832 (2d Cir. 1988). Instead of agreeing to arbitrate "all disputes" between them, the parties agreed to arbitrate only those "issues that have previously been raised in either the State Action or the Federal action." (Case Management Agreement ¶ 1.) Accordingly, in the absence of "clear and unmistakable evidence" that the parties agreed to arbitrate over arbitrability, the Court must resolve that issue. *First Options*, 514 U.S. at 943 ("If. . . the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently.").

Where, as here, the parties' agreement to arbitrate is narrow, the "presumption of arbitrability" attendant to broad arbitration clauses does not apply. *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 224 (2d Cir. 2001). As the Court observed in *Dreyfus*:

> [I]f reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. . . . Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview."

*Id.* (Internal quotation marks and citations omitted). Accordingly, in evaluating whether the parties agreed to arbitrate their dispute over the scope of the Supreme Court's ruling, the Court must consider whether this issue falls squarely within the parties' agreement to arbitrate or presents a separate or collateral issue.

### C. The Parties Never Agreed To Arbitrate Over Whether the Supreme Court's Ruling Eliminates All or Only Some of DeOliveira's Claims

It is apparent from the Case Management Agreement and the Joint Motion for Certification that the parties never agreed to arbitrate over the application of the Supreme Court's ruling to DeOliveira's claims. The Case Management Agreement reflects the parties' expectations in early December of 2003 that the arbitration would proceed concurrently with the certification/referral and could well reach a result before the Supreme Court issued a decision. (*See* Case Management Agreement at ¶1.)[4] The parties' agreement nowhere contemplated that an arbitration would proceed *after* the Supreme Court answered the Certified Questions. Rather, the parties agreed to arbitrate only those "issues that have *previously* been raised in either the State Action or the Federal Action . . . ." (Case Management Agreement at 1, ¶ 1 (emphasis added)). Axiomatically, this agreement did not cover any issues or disputes that might arise in either the State Action or the Federal Action *after* the Supreme Court ruled.

Moreover, the parties addressed how a ruling from the Supreme Court might affect them. First, they anticipated the possibility that the arbitrators might render a decision before the Supreme Court. In the Case Management Order, the parties provided that any award would be vacated "in the event that the . . . Connecticut Supreme Court answer[ed] any of the Certified Questions in a way that would bring into question the standards applied or decisions rendered in the Arbitration . . . ." (*Id.*) Second, and more to the point here because the first contingency did

---

[4] The Case Management Agreement, which the parties submitted in early December of 2003, set a sixty-day schedule for the selection of a panel and provided that the parties would "make reasonable efforts to ensure the prompt convening of the arbitration panel and the speedy completion of the Arbitration." (Case Management Agreement at ¶1.) The Case Management Agreement also provided that any award would be vacated "in the event that the . . . Connecticut Supreme Court answer[ed] any of the Certified Questions in a way that would bring into question the standards applied or decisions rendered in the Arbitration . . . ." *Id.*

not occur, the parties stipulated and agreed that the Supreme Court's "answer to the certified questions will determine, or are reasonably certain to enter into the determination of, both the state and federal court actions." (Joint Petition for Certification at 6.) Thus, the issues that the parties agreed to arbitrate did not include the scope of the Supreme Court's ruling, and they recognized that the ruling could be dispositive.

Since the Supreme Court's ruling, a dispute has arisen between the parties over whether the Supreme Court's opinion covers all of plaintiff's legal theories (as Liberty Mutual asserts) or leaves open plaintiff's claims for intentional infliction of emotional distress and CUTPA (as DeOliveira asserts). That issue was not and could not have "have previously been raised in either the State Action or Federal Action" in December of 2003, when the parties signed the Case Management Agreement. Given that the parties never agreed to arbitrate that issue, and it is a dispositive legal issue, the question of the meaning of the Supreme Court's decision remains for this Court to resolve.

### D. This Case Should Be Dismissed, Because the Connecticut Supreme Court's Ruling Eliminates All, Not Just Some of Plaintiff's Claims.

The parties correctly predicted that the Supreme Court's answer to the certified questions could "determine . . . the state and federal court actions." (Joint Petition for Certification at 6.) As explicated below, the Court's negative answer to the first certified question eliminates all of plaintiff's claims.

At the outset, it is important to note that the Supreme Court clearly understood the nature of the plaintiff's complaints and all the claims contained in them. The Court described the 1995 and 2002 complaints, respectively, as follows:

> In a seven count revised complaint directed at the defendant's actions in contesting compensability and unduly delaying payments, the plaintiff asserted claims of

> negligent, reckless and intentional conduct, implied breach of the covenant of good faith, negligent and intentional infliction of emotional distress and a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.
> * * *
> In April, 2002, the plaintiff filed a third action in Superior Court, asserting identical claims to those asserted in the pending 1995 action, but directed solely at the defendant's post-1995 conduct.

*DeOliveira v. Liberty Mutual Ins. Co.*, 273 Conn. 487, 493 (2005) (emphasis added).

The first certified question to the Supreme Court summarized and subsumed all of DeOliveira's various legal theories seeking relief for an insurer's bad faith processing of a worker's compensation claim. The parties did not ask the Court to rule on any particular legal theory – e.g., they did not request that the Court rule whether there is a cause of action for negligent/reckless/intentional intentional infliction of emotional distress or breach of the implied covenant of good faith and fair dealing or a violation of CUTPA. Rather, the parties framed the first question in terms of the alleged misbehavior of the insurer, without regard to any particular legal theory. This broad request comported with the wording of the Workers' Compensation Act, which refers to "*any* action for damages on account of personal injury sustained by an employee . . . ." Conn. Gen. Stat. § 31-284(a) (italics added). By answering the first question in the negative, the Court held that there is *no* viable cause action for an insurer's alleged "bad faith processing of a workers' compensation claim."

Without limiting itself to any specific legal theories, the Court broadly concluded that the Worker's Compensation Act exclusively governs "damages actions for injuries . . . arising out of and in the course of the workers' compensation process:"

> We agree with the California Supreme Court that "**injuries arising out of and in the course of the workers' compensation claims process fall within the scope of the exclusive remedy provisions because this process is tethered to a compensable injury. Indeed, every employee who suffers a workplace injury must go through the claims process in order to recover compensation**." *Charles J. Vacanti, M.D., Inc. v.*

> *State Compensation Ins. Fund*, 24 Cal. 4th 800, 815, 14 P.3d 234, 102 Cal.Rptr.2d 562 ( 2001); *see also Santiago v. Pennsylvania National Mutual Casualty Ins. Co.*, supra, 418 Pa. Super. 193 (alleged tortious acts of insurer in failing to pay benefits, which in turn gave rise to emotional impairment, were "'completely intertwined'" with original compensable injury); *Wolf v. Scott Wetzel Services*, Inc., 113 Wn. 2d 665, 674, 782 P.2d 203 (1989) (compensable injury under act was necessary predicate to claim for wrongful delay or termination of benefits). It also is clear that "insurer activity intrinsic to the workers' compensation claims process is also a risk contemplated by the compensation bargain. Thus, insurer actions 'closely connected to the payment of benefits' fall within the scope of the exclusive remedy provisions." *Charles J. Vacanti, M.D., Inc. v. State Compensation Ins. Fund*, supra, 821. **Consistent with this reasoning, we conclude that we must construe the exclusionary provision's prohibition on damages actions for injuries "arising out of and in the course of . . . employment" to include injuries arising out of and in the course of the workers' compensation claims process.**

*DeOliveira,* 273 Conn. at 503-04 (emphasis added).  DeOliveira's purported claims for intentional infliction of emotional distress and CUTPA – like all of his other claims – fall squarely within the description of "damages actions for injuries . . . arising out of and in the course of the workers' compensation process."

Having evaluated and described Mr. DeOliveira's two complaints, the Court also determined that this case presents no extraordinary circumstance that could conceivably fall outside the scope of worker's compensation exclusivity:

> We recognize that there could be an instance in which an insurer's conduct related to the processing of a claim, separate and apart from nonpayment, might be so egregious that the insurer no longer could be deemed to be acting as an agent of the employer and, thus, a claim arising from such conduct would not fall within the scope of the act. Some other jurisdictions have recognized such a limitation. *See, e.g., Unruh v. Truck Ins. Exchange*, 7 Cal.3d 616, 620-21, 498 P.2d 1063, 102 Cal. Rptr. 815, 102 Cal. Rptr. 815 (1972) (insurer's agent misrepresented identity to claimant, caused her to become emotionally involved with him and induced her to engage in unusual activities beyond her normal physical capabilities while another person filmed her, resulting in aggravation of her physical injury and physical and mental breakdown requiring hospitalization upon claimant discovering deceit); *Young v. Hartford Accident & Indemnity Co.*, 303 Md. 182, 193, 492 A.2d 1270 (1985) (plaintiff who suffered emotional trauma after being assaulted at work alleged that carrier, in attempt to reduce its monetary exposure, insisted on psychiatric examination with deliberate intent that plaintiff either commit suicide or drop her claim, and plaintiff thereafter attempted suicide). **The present case, however, presents no such claim.**

*Id.* at 507 (emphasis added). Thus, the Court concluded that DeOliveira's two complaints do not state claims outside of the exclusivity bar of the Worker's Compensation Act.

Section 31-284(a), which the Supreme Court found applied to Mr. DeOliveira's claimed injuries arising out of and in the course of the workers' compensation claims process, broadly "abolishes" "**[a]ll** rights and claims . . . other than rights and claims given by this chapter . . . ." Conn. Gen. Stat. § 31-284(a) (emphasis added). Indeed, the Supreme Court itself addressed the scope of its ruling relative to the parties' litigation:

> This consolidated action **is the culmination of fifteen years of litigation** between the plaintiff, Antonio DeOliveira, and the defendant, Liberty Mutual Insurance Company
> . . . .

*DeOliveira,* 273 Conn. at 489 (emphasis added). Accordingly, nothing remains to be arbitrated because the Supreme Court's ruling addressed all of Mr. DeOliveira's claims in both suits.

Resort to arbitration in these circumstances not only exceeds the scope of the parties' agreement, it would also be futile. The Connecticut Supreme Court's ruling definitively precludes the supposed claims that DeOliveira seeks to arbitrate. Indeed, the arbitrators could only issue an award in DeOliveira's favor if they were to act in manifest disregard of the Court's ruling. *See First Options*, 514 U.S. at 942 (noting that "manifest disregard" of the law is one of the reasons for vacating an arbitral award under 9 U.S.C. § 10) (citing *Wilko v. Swan*, 346 U.S. 427, 436-437, 98 L. Ed. 168, 74 S. Ct. 182 (1953) (parties bound by arbitrator's decision not in "manifest disregard" of the law), overruled on other grounds, *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 104 L. Ed. 2d 526, 109 S. Ct. 1917 (1989)). In these circumstances, courts aptly refuse to remand matters to arbitrators to engage in futile and wasteful proceedings. *See, e.g., AmeriSteel Corp. v. Int'l Bhd. of Teamsters*, 267 F.3d 264, 276 (3d Cir. 2001) (refusing to order arbitration where prevailing case law and the clear terms of the

parties' agreement rendered such proceedings futile, pointless, and inappropriate); *American Postal Workers Union v. United States Postal Service*, 682 F.2d 1280, 12 84-85 (9th Cir. 1982) (refusing to remand to arbitrators where the only way that arbitrators could rule in favor of the claimant would be in manifest disregard of the law.)[5] Accordingly, the Court should resolve the parties' new dispute over the Supreme Court's ruling and spare them the needless expense of a futile arbitration.

### E. Alternatively, Plaintiff Has Abandoned and Waived the Arbitration[6]

The parties agreed that the arbitration would take place concurrently with the certification/reservation, based on the law of the case up to that point. They specifically agreed

---

[5] *Cont'l Airlines, Inc. v. E. Pilots Merger Comm., Inc. (In re Cont'l Airlines, Inc.),* No. 04-31-SLR (consolidated), Civ. No. 04-71-SLR, 2004 U.S. Dist. LEXIS 26644 (D. Del. Dec. 13, 2004) is also illustrative. There, a plaintiff-union sought to arbitrate a specious claim against a bankrupt employer. Recognizing the futility of the plaintiffs' demands the District Court refused to allow the arbitration to proceed:

> I conclude, therefore, that allowing appellees to proceed with the LPP arbitration elevates form (the bare right to initiate arbitration) over substance (there is no substantive relief that can be achieved against the debtor-carrier, the basis for this court's jurisdiction), thus resulting in futile proceedings, the very antithesis of what either arbitration or judicial proceedings should be. The fact that appellees have pursued their claims for over a decade, long after their cause had been finally determined and lost, is not laudable. Instead, the relentless pursuit of the specific performance of the LPPs, despite the adverse court rulings, represents a waste of the assets of the estate, as well as a tremendous waste of scarce judicial resources. For all of these reasons, I respectfully reverse the bankruptcy court's opinion and order and grant the appeal. The appellees are hereby enjoined from pursuing the LPP arbitration proceeding.

[6] Although questions of waiver, estoppel, laches, and time limits are generally the kind of procedural issues that presumptively are referable to arbitrators, *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38*, 351 F.3d 43, 45-46 (2d Cir. 2003), the question of whether a party has waived a right to arbitrate through litigation-related activity is a matter for a court to resolve. *Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 27-28 (1st Cir. 2005) (noting, however, the existence of conflicting authority on this point). Moreover, the parties here narrowly specified the issues to be arbitrated, issues which did not include waiver, estoppel, laches, or time limitations.

to follow a sixty-day schedule for the selection of a panel and to "make reasonable efforts to ensure the prompt convening of the arbitration panel and the speedy completion of the Arbitration." (Case Management Agreement at ¶1.) The arbitration never went forward. Indeed, plaintiff's party-arbiter never even disclosed his conflicts, leaving his ability to be impartial in doubt after more than a year. The parties' agreement to arbitrate was clearly based on an understanding that the arbitration would be concurrent with the certification to the Supreme Court. The time for that arbitration has passed. For whatever reason – either because he made strategic decision to seek the Supreme Court's advice before proceeding with arbitration or because of inattention – the plaintiff chose to proceed to obtain a result in court and to abandon the concurrent arbitration. The plaintiff cannot now disregard the full scope of the Court's ruling and demand that the parties proceed with a pointless arbitration over claims that no longer exist. Accordingly, the plaintiffs' complaint in this action should be dismissed.

### III. CONCLUSION

For all the foregoing reasons, the defendant respectfully requests that this case be dismissed in its entirety, with prejudice and without costs.

DEFENDANT,
LIBERTY MUTUAL INSURANCE CO.


By_____
Daniel L. FitzMaurice (ct 05331)
Michelle I. Turner (ct24012)
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499
(860) 275-0100
Its Attorneys

## **CERTIFICATION**

      This is to certify that on this date a copy of the foregoing was mailed, first class postage prepaid, to:

Laurence V. Parnoff, Esq.
1566 Park Avenue
Bridgeport, CT 06604

                                                                         _____
                                                                          Daniel L. FitzMaurice